No. 18-35592

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

DANIEL WALKER,

Plaintiff-Appellant,

v.

FRED MEYER, INC.,

Defendant-Appellee.

On Appeal from the United States District Court
For the District of Oregon,
Case No. 1:17-cv-1791-YY
The Honorable Michael H. Simon, United States District Judge.

---

REPLY BRIEF FOR
PLAINTIFF-APPELLANT DANIEL WALKER

---

Neal Weingart
(neal@neilweingartlaw.com)
JONES & SWARTZ PLLC
1001 SW Fifth Ave., Ste. 1415
Portland, Oregon 97204
Telephone: (503) 379-9933

Steven L. Woodrow
(swoodrow@woodrowpeluso.com)
Patrick H. Peluso
(ppeluso@woodrowpeluso.com)
WOODROW & PELUSO, LLC
3900 East Mexico Avenue
Ste. 300
Denver, Colorado 80210

*Attorneys for Plaintiff-Appellant Daniel Walker*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iv

SUMMARY OF THE ARGUMENT ......................................................... 1

ARGUMENT ......................................................................................... 3

I.    IN VIOLATION OF THE FCRA, FRED MEYER'S CONSUMER REPORT DISCLOSURE CONTAINS EXTRANEOUS INFORMATION THAT RENDERS IT UNCLEAR ......................... 3

    A.    The Court Has Reaffirmed The Plain Meaning Of The FCRA In Its Syed And Gilberg Decisions .......................................... 3

    B.    Fred Meyer's Disclosure Form Is Replete With Information Regarding Investigative Consumer Reports And Other Surplusage ................................................................................ 8

        1.    Fred Meyer's form improperly combines disclosures for consumer reports with information regarding investigative consumer reports ......................................... 9

    C.    Though The Documents Are Technically Separate, Fred Meyer's Authorization Is Presented Simultaneously With The Disclosure And Deprives Consumers Of The Ability To Meaningfully Authorize Their Reports ................................. 16

II.    FRED MEYER'S PRE-ADVERSE ACTION NOTICE IS INSUFFICIENT TO SATISFY THE FCRA ................................... 20

    A.    The FCRA Requires Pre-Adverse Action Notice To Apprise Applicants Of Their Rights, Particularly The Right To Change The Employer's Mind ............................................... 21

    B.    Fred Meyer's Notice Is Insufficient Because It Does Not Provide A Meaningful Opportunity For Applicants With Correct Information To Explain Their Report ..................... 24

C.    Fred Meyer's Claim That Ruling In Favor Of Walker Will "Upend" The Consumer Reporting Industry Misunderstands The Relief That Walker Seeks ................................................ 28

CONCLUSION ......................................................................... 32

CERTIFICATE OF COMPLIANCE ......................................... 33

PROOF OF SERVICE .............................................................. 34

# TABLE OF AUTHORITIES

## CASES

*Feist v. Petco Animal Supplies, Inc.*,
 218 F. Sup. 3d 1112 (S.D. Cal. 2016) ..........................................5–6

*Gilberg v. Cal. Check Cashing Stores, LLC*, No. 17-16263,
 2019 WL 347027 (9th Cir. January 29, 2019) .........................6–7, 9

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) .......................4

*Lagos v. Leland Stanford Junior Univ.*, No. 5:15-cv-04524-PSG,
 2015 WL 7878129 (N.D. Cal. Dec. 4, 2015) .................................5, 9

*Magallon v. Robert Half Int'l, Inc.*,
 311 F.R.D. 625 (D. Or. 2015)..................................................23, 32

*Mix v. Asurion Ins. Servs. Inc.*, No. CV-14-02357-PHX-GMS,
 2016 WL 7229140 (D. Ariz. Dec. 14, 2016) ...................................25

*Peikoff v. Paramount Pictures Corp.*, No. 15-cv-00068-VC,
 2015 WL 13650922 (N.D. Cal. Mar. 26, 2015).................................9

*Shelton v. Hal Hays Constr., Inc.*, No. 18-35592,
 2016 WL 8904414 (C.D. Cal. July 29, 2016)...................................6

*Syed v. M-I, LLC*, 853 F.3d 492 (9th Cir. 2017)............................. *passim*

*Thomas v. FTS USA, LLC*,
 193 F. Supp. 3d 623 (E.D. Va. 2016).................................22–23, 25

*United States v. M.H. Pulaski Co.*, 243 U.S. 97 (1917) ...........................4

*Walker v. Fairbanks Inv. Co.*, 268 F.2d 48 (9th Cir. 1959) .....................6

## STATUTES, RULES, AND OTHER SOURCES

Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq.* .......................... *passim*

*American Heritage Dictionary of the English Language* 1666
    (5th ed. 2011) ............................................................... 4–5

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE,
    MINISTERIAL (5th ed. 2019),
    www.ahdictionary.com/word/search.html?q=ministerial ............. 30

FED. TRADE COMM. (F.T.C.), 40 YEARS OF EXPERIENCE WITH THE FAIR
    CREDIT REPORTING ACT: AN FTC STAFF REPORT WITH SUMMARY OF
    INTERPRETATIONS (2011), *available at*
    www.ftc.gov/sites/default/files/documents/reports/40-years-
    experience-fair-credit-reporting-act-ftc-staff-report-summary-
    interpretations/110720fcrareport.pdf
    (last visited Feb. 8, 2019) ........................................ 13, 14

*FTC Advisory Opinion to Allan* (Feb. 14, 2000) ..................................... 30

*FTC Advisory Opinion to Coffey* (Feb. 2, 1998) ................................. 9, 22

*FTC Advisory Opinion to Lewis* (June 11, 1998) ............................ 21–22

*FTC Advisory Opinion to Rosen* (June 9, 1998) ..................................... 30

*FTC Advisory Opinion to Weisberg* (June 27, 1997) .............................. 21

*FTC Advisory Opinion to Willner* (Mar. 25, 1999) ............................ 9–10

## SUMMARY OF THE ARGUMENT

I.      Fred Meyer's FCRA form fails to clearly disclose in a standalone document that a consumer report will be obtained for employment purposes. The FCRA's plain language, as confirmed in *Syed* and *Gilberg*, requires a consumer report disclosure to be made clearly and conspicuously in a document that consists *solely* of the disclosure. In violation of the Act, Fred Meyer's disclosure form is replete with extraneous information that renders it unclear and confusing.

Fred Meyer attempts to downplay such additional provisions, asserting that its disclosure doesn't run afoul of the FCRA because the extra language it chose to include doesn't describe the "nature and scope" of an investigative consumer report. This misses the point. *Any* extraneous information is prohibited. And in any case, the extra language in Fred Meyer's disclosure is precisely the type of additional information that the FTC cautioned against including in *Willner*.

Furthermore, Fred Meyer asks the Court to ignore the authorization form because it is set forth on a separate piece of paper from the disclosure. While the documents may be separate, they were presented to Walker and others at the same time and worked in tandem

1

to confuse Walker and other applicants and deny them the ability to meaningfully authorize the reports. Fred Meyer's disclosure form thus violates the FCRA and the District Court's dismissal of the claim should be dismissed.

II.    The pre-adverse action notice that Fred Meyer provided to Walker and other applicants was also inadequate to satisfy the FCRA. The statute requires a description of rights, including the right to discuss negative items directly with an employer before adverse action is taken. Fred Meyer's notice diverted all consumer report disputes to GIS, providing no meaningful avenue for applicants with correct, negative information to discuss their reports. In short, Fred Meyer's pre-adverse action notice does not comply with the FCRA.

Fred Meyer asserts that Walker seeks to "upend" the credit reporting industry by prohibiting employers from using reporting agencies. This misunderstands Walker's claims, which seek only to give applicants notice of their rights under the FCRA and a real opportunity to discuss their reports with prospective employers. Put simply, employers may utilize consumer reporting agencies, but the agencies cannot fulfill obligations that the statute requires be performed by the employers themselves.

2

**ARGUMENT**

I.   **IN VIOLATION OF THE FCRA, FRED MEYER'S CONSUMER REPORT DISCLOSURE CONTAINS EXTRANEOUS INFORMATION THAT RENDERS IT UNCLEAR.**

As Walker stated in his Opening Brief, the District Court committed reversible error when it dismissed his claim for violation of § 1681b(b)(2)(A)(i) of the FCRA. Fred Meyer's consumer report disclosure contains extraneous information that violates the statute's stand-alone disclosure requirement. In light of both the plain language of the statute and recent Ninth Circuit precedent, Fred Meyer's attempts to downplay the word "solely" are ineffective. Further, the additional information Fred Meyer chose to include has been specifically identified as extraneous by the FTC. Finally, although the authorization may be a separate document, the Court should not overlook that it was provided together with the disclosure, is replete with extraneous and confusing information, and denied applicants and employees the ability to meaningfully authorize their reports.

   A.   **The Court Has Reaffirmed The Plain Meaning Of The FCRA In Its *Syed* And *Gilberg* Decisions.**

In its Answering Brief, Fred Meyer urges the Court to reject the plain language of the FCRA as if it were simply Walker's "narrow

3

interpretation" of the law. (ECF 19, at 7.) This argument fails. The stand-alone disclosure requirement of § 1681b(b)(2)(A)(i) is clear, and the Court has held in both *Syed* and *Gilberg* that the statutory language means what it says.

Section 1681b(b)(2)(A)(i) of the FCRA requires employers to make a "clear and conspicuous disclosure" to employees or prospective employees of their intent to procure a consumer credit report. 15 U.S.C. § 1681b(b)(2)(A)(i). The statute requires that this disclosure must be made "in a document that consists **solely** of the disclosure." *Id.* (emphasis added). This is the FCRA's "stand-alone" disclosure requirement.

As the Court acknowledged in *Syed*, the stand-alone requirement of section 1681b(b)(2)(A)(i) is unambiguous:

> We must begin with the text of the statute. Where congressional intent "has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S. Ct. 3245, 73 L.Ed.2d 973 (1982) (internal quotation marks omitted). And when "the meaning of the words seems to us to be intelligible upon a simple reading, ... we shall spend no time upon generalities concerning the principles of [statutory] interpretation." *United States v. M.H. Pulaski Co.*, 243 U.S. 97, 106, 37 S.Ct. 346, 61 L.Ed. 617 (1917).

**The ordinary meaning of "solely" is "[a]lone; singly" or**

4

> **"[e]ntirely; exclusively."** *American Heritage Dictionary of the English Language* 1666 (5th ed. 2011)

*Syed*, 853 F.3d 492, 500 (9th Cir. 2017) (emphasis added). "That other FCRA provisions mandating disclosure omit the term 'solely' is further evidence that Congress intended that term to carry meaning in 15 U.S.C. § 1681b(b)(2)(A)(i)." *Id.* at 501. Even though the statute contains an express exception for an accompanying authorization, the Court explained that, "in light of Congress's express grant of permission for the inclusion of an authorization, the familiar judicial maxim *expressio unius est exclusio alterius* counsels against finding additional, implied, exceptions." *Syed*, 853 F.3d at 501. Accordingly, under the plain language of the statute any extraneous information contained in a disclosure form (aside from the authorization) violates the FCRA.

To combat the Court's holding in *Syed*, Fred Meyer first relies on several district court opinions that were cited by Magistrate Judge You in her Findings and Recommendations. (ECF 19, at 8–9.) In these decisions, the district courts expanded on "implied exceptions" for information that is supposedly related to the disclosure. *See Lagos v. Leland Stanford Junior Univ.*, 2015 WL 7878129, at *2 (N.D. Cal. Dec. 4, 2015); *Feist v. Petco Animal Supplies, Inc.*, 218 F. Supp. 3d 1112,

1115 (S.D. Cal. 2016); *Shelton v. Hal Hays Constr., Inc.*, No. 18-35592, 2016 WL 8904414, at *3 (C.D. Cal. July 29, 2016). None of these opinions bind the Court, and each of them was decided before *Syed*.

Fred Meyer next repeats a particular line from the *Syed* opinion in which the Court cited a general proposition that implied exceptions are rarely justified. (ECF 19, at 9); *see Syed*, 853 F.3d at 501 (citing *Walker v. Fairbanks Inv. Co.*, 268 F.2d 48, 53 (9th Cir. 1959)). Fred Meyer claims this line undercuts *Syed* (and Walker's argument), but the *Syed* Court recognized an implied exception as justifiable "only when it comports with the basic purpose of the statute." *Syed*, 853 F.3d at 501. Further, the Court included this proposition to precede its determination that an exception to the FCRA's stand-alone requirement *should not* be found: "Here, an implied exception permitting the inclusion of a liability waiver on the same document as the disclosure does not comport with the FCRA's basic purpose." *Id.* at 501–02.

The Court's opinion in *Syed* is not an anomaly. Just weeks ago, the Court issued another opinion that reinforces the FCRA's unambiguous mandate. *See Gilberg v. Cal. Check Cashing Stores, LLC*, No. 17-16263, 2019 WL 347027, at *4–5 (9th Cir. January 29, 2019). In *Gilberg*, the Court found that state law disclosures, like the liability

6

waiver at issue in *Syed*, constitute extraneous information that violates the FCRA's stand-alone requirement. *Id.* at *1. Though the respondent in *Gilberg* attempted to distinguish *Syed*, the Court clarified that "*Syed*'s holding and statutory analysis were not limited to liability waivers; *Syed* considered the standalone requirement with regard to any surplusage." *Id.* at *5. This is due to the clarity of the FCRA:

> We concluded [in *Syed*] the statute meant what is said: the required disclosure must be in a document that "consist[s] 'solely' of the disclosure." We based this holding on the statute's plain language, noting "[w]here congressional intent 'has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.'"

*Id.* at *4 (citing *Syed*, 853 F.3d at 496, 500) (internal citations omitted).

Taken together, both *Gilberg* and *Syed* hold "that the standalone requirement forecloses implied exceptions." *Gilberg*, 2019 WL 347027, at *5. Even if extraneous information is included under the guise of furthering the purpose of the FCRA, "purpose does not override plain meaning." *Id.* The Court further noted that "even 'related' information may distract or confuse the reader." *Id.* In other words, the presence of extraneous information in a disclosure form that is "as likely to confuse as it is to inform" does not further the purpose of the FCRA. *Id.*

Fred Meyer's efforts to minimize the plain language of the FCRA

7

are unavailing. The Court's opinions in *Syed* and *Gilberg* demonstrate that the clear, unambiguous stand-alone requirement of § 1681b(b)(2)(A)(i) is not a provision to be undercut through the use of implied exceptions. Extraneous information in a disclosure form that confuses applicants, as Walker has alleged (*see* ER35, ER38), violates the plain wording of the statute. Fred Meyer's disclosure form is neither clear nor set forth in a document that consists solely of the required disclosure. Fred Meyer has therefore violated the FCRA, and the lower court's dismissal of the case should be reversed and remanded.

### B.    Fred Meyer's Disclosure Form Is Replete With Information Regarding Investigative Consumer Reports And Other Surplusage.

Despite the plain language of the statute and the holdings of *Syed* and *Gilberg*, Fred Meyer urges the Court to apply a more permissive standard as outlined by the FTC and several district courts. The Court should refuse to adopt such rulings. Yet even if the Court were to reject its own opinions and apply an alternate standard, Fred Meyer's disclosure form is still clouded with extraneous information about the nature and scope of investigative consumer reports and other extraneous information.

### 1. Fred Meyer's form improperly combines disclosures for consumer reports with information regarding investigative consumer reports.

In its brief, Fred Meyer leans frequently on an implied exception to the FCRA's stand-alone requirement for items "closely related" to the disclosure. (ECF 19, at 1, 8, 13.) Rooted in (non-binding) FTC guidance, this approach has been used by several district courts, including by Magistrate Judge You in the instant case. *See FTC Advisory Opinion to Coffey* (Feb. 2, 1998); *Lagos v. Leland Stanford Junior Univ.*, No. 5:15-cv-04524-PSG, 2015 WL 7878129, at *1–2 (N.D. Cal. Dec. 4, 2015); *Peikoff v. Paramount Pictures Corp.*, No. 15-cv-00068-VC, 2015 WL 13650922, at *1 (N.D. Cal. Mar. 26, 2015); (ER21–22). This analysis stands in sharp contrast to the Court's subsequent holdings in *Syed* and *Gilberg*—that implied exceptions should not be read into the FCRA, even for related information. *Syed*, 853 F.3d at 501–02; *Gilberg*, 2019 WL 347027, at *5.

The FTC warned in *FTC Advisory Opinion to Willner* (Mar. 25, 1999) ("*Willner*") that employers may only include a limited disclosure regarding investigative consumer reports in the standard consumer report disclosure, whereas a detailed description of any investigative

9

report would likely overshadow the disclosure. As detailed in Walker's Opening Brief, *Willner* emphasized that any additional information must not overshadow the disclosure, and the FTC referred specifically to information about the nature and scope of investigative reports:

> Section 604(b)(2)(A)'s [stand-alone] requirement raises the issue of what (if any) other items may be included on that document.... [T]he intent of this provision is to insure that the disclosure appears conspicuously in a document ***unencumbered by other information***.... We believe that a ***limited*** Section 606(a) disclosure would also be permissible, on the same theory. . . . However, a Section 606(b) notice setting forth the nature and scope of the investigation would of necessity be much more detailed and would likely be held to *overshadow* 604(b) disclosure in violation of 604(b)(2)(A). Therefore, we believe that an employer may combine *only a very limited* Section 606(a) notice with the general Section 604(b)(2)(A) notice without running afoul of the latter section's requirement that the required disclosure be in a stand-alone document.

*Willner* (emphasis added). Hence, *Willner* permits a "very limited" notice that involves just (1) a statement that an investigative report may be obtained, and (2) a statement that the applicant may request disclosure of the nature and scope of the report. *See id.* This is clearly more permissive than the plain language as read by *Syed* and *Gilberg*, under which neither statement would be allowed. Hence, to the extent it is considered at all, *Willner* presents a ceiling—an upper limit on the level of additional information that an employer may sneak into an

FCRA disclosure—not a floor.

Applied here, Fred Meyer's disclosure form contains more information than even *Willner*'s more lenient guidance would permit. The disclosure is titled "Disclosure Regarding Consumer Reports and Investigative Consumer Reports," and it states that an investigative consumer report may be obtained in the disclosure's first paragraph:

> We (The Kroger family of companies) will obtain one or more consumer reports or investigative consumer reports (or both) about you for employment purposes. . . . The reports will include information about your character, general reputation, personal characteristics, and mode of living.

(ER30.) Fred Meyer asserts that because "character, general reputation, personal characteristics, and mode of living" are in the definition of consumer reports, the first paragraph cannot be read to refer to investigative reports. (ECF 19, at 18–19.) However, these words appear verbatim in the definition of investigative reports as well. *See* 15 U.S.C. § 1681a(e). The only informational difference between these definitions is credit worthiness, standing and capacity—terms that appear in the definition of consumer reports but are conspicuously absent from Fred Meyer's disclosure. Thus, the most natural reading of the first paragraph is that it refers to either "consumer reports or investigative consumer reports (or both)." (ER30.)

11

Fred Meyer also states in the closing paragraph that applicants may request disclosure of the nature of the investigation "[i]f GIS obtains any information by interview." *Id.* Under *Willner*, the first and last paragraph appear to be permitted. Not surprisingly, Fred Meyer claims in its Answering Brief that these are the *only* references to investigative consumer reports that it makes. (ECF 19, at 15–16.) But the disclosure contains more.

In the third paragraph, Fred Meyer details what could only be described as the nature and scope of the reports that it will obtain:

> To prepare the reports, GIS may investigate your education, work history, professional licenses and credentials, references, address history, social security number validity, right to work, criminal record, lawsuits, driving record, and any other information with public or private information sources.

(ER30.) This paragraph refers to "reports," after describing both investigative and consumer reports in the first paragraph, which leaves the applicant unsure as to what is being described. Fred Meyer plainly states, however, that GIS may investigate "references" and "any other information with public or private information sources." *Id.* As stated in the Opening Brief, these sources extend well beyond a consumer report and are broad enough to encompass interviews, particularly of references.

12

Fred Meyer responds by claiming that it is "illogical" to assert that the disclosure form describes the nature and scope of the reports it will obtain, largely because the final paragraph allows applicants to request a "complete and accurate" description of the investigative report after it is performed. (ECF 19, at 16); (ER30). To support this line of reasoning, Fred Meyer cites an FTC staff report to demonstrate that a more detailed "nature and scope" disclosure is required to satisfy § 1681d(b), or Section 606(b) of the FCRA. (ECF 19, at 16–17.) This report notes that compliance with Section 606(b) requires "a complete and accurate description of the types of questions asked, the types of persons interviewed, and the name and address of the investigating agency." FED. TRADE COMM. (F.T.C.), 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT: AN FTC STAFF REPORT WITH SUMMARY OF INTERPRETATIONS (2011), 64, *available at* www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf (last visited Feb. 8, 2019).

Walker does not contend that he understands the logic of Fred Meyer's disclosure form, nor does he contend that the description provided in the form is FCRA compliant. The form provides a list of

potential sources that GIS may "investigate," which includes an applicant's references and *any public or private information source*. (ER30.) Listing GIS's potential information sources (i.e. the nature and scope of the investigation GIS will conduct) may not be sufficient to comply with §1681d(b), but not to worry—upon request, Fred Meyer will provide a more complete disclosure after the investigation is complete. The cumulative effect of these references to investigative consumer reports is as *Willner* predicted: the disclosure form has become overshadowed by extraneous information.

Further, though the description in the disclosure form may not amount to a full disclosure under Section 606(b), it does contain key features. Paragraph three reveals that "references" may be investigated, describing at least one type of person that may be interviewed. (ER30.) Additionally, paragraph two provides details and contact information for GIS—the name and address of the investigating agency is another requirement for a Section 606(b) disclosure. *Id.*; *see also* F.T.C., 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT, at 64.

Of course, in addition to investigative consumer report disclosures, Fred Meyer's form also includes a notification that GIS will

perform the search, that the applicant or employee can inspect GIS's files by providing identification to GIS, and that another person can accompany the applicant to inspect GIS's files if that person also brings proper identification. Furthermore, the form includes a space for the applicant to sign—not to authorize the report, but rather to merely "acknowledge [their] receipt of this disclosure." (ER30.)

Under the FTC's more relaxed standard (which, again, the Court should not adopt), the question is not whether Fred Meyer inserted a FCRA-compliant "nature and scope" description into its disclosure, but whether the form was overshadowed and impermissibly clouded by extraneous information. Fred Meyer describes both consumer reports and investigative consumer reports in the same form, and thereafter fails to distinguish them. It then provides details about the investigating agency and the sources that will be investigated. It ultimately contains a space for a signature but not for the authorization specifically contemplated by the statute. Hence, even under the permissive standard that Fred Meyer urges the Court to apply, the disclosure form contains extraneous information and violates the "clear and conspicuous" and standalone requirements of the FCRA.

**C.** **Though The Documents Are Technically Separate, Fred Meyer's Authorization Is Presented Simultaneously With The Disclosure And Deprives Consumers Of The Ability To Meaningfully Authorize Their Reports.**

As explained in Walker's Opening Brief, Fred Meyer's accompanying authorization form further muddles the two types of reports and reinforces the confusion created by the disclosure. Though the authorization may be a distinct document, the two forms work in tandem and were presented to Walker and other applicants simultaneously. Yet, to be clear, Walker does not ask the Court to find that the authorization form separately violates FCRA—instead, Walker request that the Court consider the combined effect of the confusing language that appears in both forms as presented together. The disclosure itself violates the FCRA, and the authorization confirms why applicants would be confused: neither form distinguishes between consumer reports and investigative consumer reports and both forms contain extraneous information.

The FCRA requires that consumers must authorize in writing the procurement of a consumer report by the employer. 15 U.S.C. § 1681b(b)(2)(A)(ii). Though the statute does not have similar "clear and conspicuous" or stand-alone requirements for the authorization, it is a

necessary companion to the disclosure requirement in order to protect

consumer privacy:

> Had the [FCRA] required disclosure without conditioning the procurement of a consumer report on the job applicant's authorization, it would have failed to give the applicant control over the procurement of the personal information contained in the consumer report. On the other hand, had the statute conditioned the procurement of a report on the job applicant's authorization without mandating clear disclosure by the prospective employer, Congress's purpose would have been frustrated because applicants would not understand what they were authorizing. The disclosure and authorization clauses therefore work in tandem to further the congressional purpose of protecting consumers from "improper invasion[s] of privacy."

*Syed*, 853 F.3d at 501 (citations omitted). Thus, presenting the

documents closely together can serve to better inform consumers. *See*

*id.*

Fred Meyer correctly reminds the Court that "§ 1681b(b)(2)(A)(ii)

does not impose any limitation on the inclusion of extraneous

information." (ECF 19, at 23.) However, Fred Meyer also claims that

Walker asserts the forms must be read as one document, or that

extraneous information in the authorization "should somehow operate

to invalidate" the disclosure. (*Id.* at 22–23.) Neither of these claims is

accurate. Walker acknowledged in his Opening Brief that the

documents are separate (ECF 10, at 29), and likewise he did not

17

contend that the authorization would somehow invalidate the disclosure on its own. Walker simply points out that the authorization "reiterates the confusing terms of the disclosure," which highlights the extraneous inclusions and overshadowing in the disclosure. (*Id.* at 31.)

To review, Fred Meyer provided Walker with a distinct authorization form, presented simultaneously with the disclosure. (ER31.) According to its title, the form pertains to both consumer reports and investigative consumer reports, and its contents describe both without making any distinction. (*Id.*) The form authorizes GIS to provide "one or more reports" after investigating, *inter alia*, "references," "credit history," and "any other information with a public or private source." (*Id.*) The form also authorizes "anyone" at all to provide information to GIS. (*Id.*) This renders it entirely unclear to an applicant or employee what is actually being authorized. That is, the authorization does not simply authorize Fred Meyer to obtain a consumer report from GIS; it also authorizes complete strangers to share information with GIS. Moreover, it contains acknowledgements that certain documents have been received and that the authorization will remain in effect throughout the course of employment. As the authorization is singular—the consumer has no ability to pick and

18

choose which items he or she is authorizing or acknowledging, the form frustrates the statutory goal of ensuring a meaningful authorization.

Hence, just as the disclosure is unclear about the type of report Fred Meyer will obtain, the authorization makes it unclear what type of report is being authorized. Lack of clarity in an authorization form may or may not be its own violation of the FCRA, but in either case the FCRA's purpose is "frustrated" when consumers are deprived of their ability to meaningfully authorize the reports. *See Syed*, 853 F.3d at 501.

In effect, Fred Meyer has asked the Court to ignore the authorization because, as Walker admits, it appears on a separate piece of paper. But the forms are presented together, and they are designed to operate in tandem. Here, the forms operate together to obfuscate the nature of the rights at issue. The disclosure form contains extraneous information that confuses applicants about what is being disclosed. The authorization form provides no relief to this confusion, continuing to wrap the report types together and detailing a variety of information sources that may be investigated in a way that deprives consumers of the ability to meaningfully authorize their reports.

On its own, the disclosure form violates the FCRA by including extraneous information. But a similar lack of clarity in the

authorization compounds consumer confusion in a manner that should not be ignored. Fred Meyer's disclosure failed to give the applicants meaningful control over the dissemination of their personal information, and the authorization did not make clear to applicants what they were authorizing. The District Court erred by overlooking the interplay of these documents and their collective, negative impact on Walker's and other applicants' privacy rights.

## II. FRED MEYER'S PRE-ADVERSE ACTION NOTICE IS INSUFFICIENT TO SATISFY THE FCRA.

The District Court also erred when it dismissed Walker's pre-adverse action notice claim. Fred Meyer's pre-adverse action notice was inadequate to satisfy the FCRA. The statute requires a description of rights, including the right to discuss the report directly with the employee before adverse action is taken. Fred Meyer's notice diverted any and all discussion of reports to GIS, providing no real opportunity for applicants with correct, negative reports to change Fred Meyer's mind before being fired. Contrary to Fred Meyer's assertions, Walker doesn't seek to "upend" the credit report industry—he simply asks that consumers be given a fair appraisal of their rights and an opportunity to exercise them before an employer takes adverse action.

**A. The FCRA Requires Pre-Adverse Action Notice To Apprise Applicants Of Their Rights, Particularly The Right To Change The Employer's Mind.**

To comply with the FCRA, employers must include a description of rights in a pre-adverse action notice to employees. Among the rights that must be included in this description is the right to discuss the report with the party making the employment decision before adverse action is taken. Indeed, this is the primary purpose of the pre-adverse action notice requirement, and Fred Meyer's perfunctory and diversionary process falls short.

Section 1681b(b)(3)(A) of the FCRA mandates that employers provide applicants with a copy of any consumer report procured and a description of their rights under the FCRA before taking adverse action based on the report. 15 U.S.C. § 1681b(b)(3)(A). One of these rights is the right to contest the information contained in the report. *See id.* § 1681b(b)(3)(B)(i)(IV). The right to dispute is "among the most important the FCRA gives consumers." *FTC Advisory Opinion to Weisberg* (June 27, 1997). However, this right is not limited to simply disputing incorrect information, but "allow[s] consumers to *discuss* the report *with employers* before adverse action is taken." *FTC Advisory Opinion*

21

*to Lewis* (June 11, 1998); *FTC Advisory Opinion to Coffey* (Feb. 11, 1998) (emphasis added).

Fred Meyer challenges Walker's reference to the FTC's guidance, arguing that "FTC staff opinions are of so little precedential value" that the Court should completely ignore them. (ECF 19, at 39.) This argument is peculiar given Fred Meyer's *own* reliance on FTC advisory opinions throughout its answering brief. (*See id.* at 7–8, 15, 31.) Admittedly, the Court in *Syed* reasoned in a footnote that it would not rely on FTC advisory opinions because "informal opinion letters do not constitute authoritative guidance." *Syed*, 853 F.3d at 504, n. 6. Yet Walker does not ask the Court to adhere to the FTC opinions as binding or precedential authority. Rather, Walker simply asks the Court to acknowledge them as they are: advisory opinions from an agency admittedly tasked with enforcing and administering the FCRA. While they may not constitute controlling authority, they remain relevant and informative.

Consequently, Walker also cited to courts that expressed the purpose of the pre-adverse action notice requirement in the same manner. The Eastern District of Virginia in *Thomas*, cited approvingly in *Syed*, explained that "this subsection [of the FCRA] provides

consumers against whom adverse employment action is contemplated with a right to have time to discuss the reports with their current or prospective employer" before being fired. *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 638 (E.D. Va. 2016). Likewise, in *Magallon*—a case decided in this circuit—the District of Oregon held that "to comply with the statute, an employer who intends to take adverse action must give the applicant an opportunity to change the employer's mind." *Magallon v. Robert Half Int'l, Inc.*, 311 F.R.D. 625, 633 (D. Or. 2015). Though, as Fred Meyer points out, these cases may have been decided on different facts, the legal standards are clearly identified and broadly applicable.

In response, Fred Meyer suggests that these cases either don't apply or that they weaken Walker's case because they elsewhere note that applicants may "otherwise respond" instead of discussing the reports with their employers. (ECF 19, at 43.) Of course, if an applicant spots an error in their report and would like to dispute the error with the reporting agency, they may "otherwise respond" by contacting the agency directly. However, the pre-adverse action notice provision requires employers to inform applicants of their rights. This includes the right to discuss the reports with their employer, rather than just being referred to the reporting agency as a limited avenue for disputes.

23

The pre-adverse action notice required by the FCRA is relatively simple: before taking adverse action based on a consumer report, employers must describe the rights of applicants under the FCRA, including the right to dispute inaccuracies or discuss the report with the party tasked with making the employment decision. A notice form that does not adequately inform employees of these rights fails to satisfy the statute, and, accordingly, the form should be invalidated as in violation of the FCRA.

**B.    Fred Meyer's Notice Is Insufficient Because It Does Not Provide A Meaningful Opportunity For Applicants With Correct Information To Explain Their Report.**

By diverting any and all discussion of consumer reports to GIS, Fred Meyer failed to provide applicants facing correct, negative reports with a meaningful opportunity to discuss the reports with Fred Meyer or attempt to change its mind before taking adverse action. Disputing inaccuracies with GIS may be useful to applicants, but any further discussion would be fruitless because GIS has no authority to make employment decisions. Fred Meyer provided an improper description of the rights of Walker and other applicants to discuss their reports, and thus Fred Meyer violated the FCRA.

As the District Court correctly acknowledged, the protections in the FCRA are not conditioned on the accuracy or inaccuracy of the consumer report. (ER11.) In other words, it is not just applicants with incorrect reports that can be harmed: "information that is true but amenable to contextual explanation, delivered without time to provide that explanation, does create a risk of real harm." *Mix v. Asurion Ins. Servs. Inc.*, No. CV-14-02357-PHX-GMS, 2016 WL 7229140, at *5 (D. Ariz. Dec. 14, 2016).[1] When information in the report is correct, applicants suffer harm if they are deprived of the opportunity to "tell their side of the story" and explain any mitigating factors before adverse action is taken. *See Thomas*, 193 F. Supp. 3d at 638.

Such harm has occurred here because Fred Meyer only offers employees a chance to dispute the report with GIS, a credit reporting agency that admittedly plays no part in hiring decisions and cannot provide an explanation for any adverse actions. (ER33.) As a result, and as explained in Walker's Opening Brief, discussing an accurate report with GIS is futile because GIS doesn't make hiring decisions and

---

[1] Fred Meyer asserts that Walker cited to an incorrect page of the *Mix* opinion. (ECF 19, at 44, n. 3.) However, Walker's citation is to the correct Westlaw pagination, which is likely different from pagination in the Lexis database, as cited by Fred Meyer.

therefore has no mind to change.

Fred Meyer argues in response that Walker has made an "illogical" assumption that GIS doesn't even *communicate* with Fred Meyer. (ECF 19, at 33.) Walker has made no such assumption or argument. Instead, Walker recognizes that a consumer reporting agency, tasked with procuring reports and ensuring their accuracy, is not in a position to counsel Fred Meyer on the suitability of potential employees. Determining whether an applicant is suitable for a position is the nature of a hiring decision—a decision made by Fred Meyer and explicitly disavowed by GIS. (*See* ER33.) Indeed, GIS "does not make any decisions regarding hiring for Fred Meyer." (ECF 19, at 33.)

On the other hand, correcting inaccuracies in a consumer report is not just a task but a primary responsibility that GIS owes to Fred Meyer and to consumers. This is why Walker noted in his Opening Brief that discussing *inaccurate* reports directly with GIS would be of value to applicants. (ECF 10, at 38.) Fred Meyer attempts to discredit Walker's argument by removing emphasis from this statement, but the context in which it was made is obvious: disputing inaccuracies with a consumer reporting agency is constructive, but discussing accurate reports is valueless when the agency doesn't make hiring decisions.

26

Fred Meyer posits that consumer report corrections can only be effective if GIS passes along relevant information. (ECF 19, at 33–34.) In the case of a correction, "relevant information" is the updated, accurate report. This is the information that GIS was hired to provide. If the report is accurate, GIS would have no relevant information to pass along: the report is up to date and correct, and GIS's work is complete.

Fred Meyer also argues both that (1) Walker was not "foreclosed" from contacting Fred Meyer regarding his report (ECF 19, at 35), and (2) Walker cannot claim a violation of the FCRA because he didn't contact Fred Meyer prior to being fired. (*Id.* at 48.) Neither of these arguments addresses Walker's claim that the pre-adverse action notice was inadequate. The notice sent by GIS informed Walker and other applicants only that they could contact GIS directly and only to "dispute" the reports. (ER32.) Whether they were "foreclosed" from discussing the reports with Fred Meyer misses the point—they were neither informed of their right, nor given an opportunity, to change Fred Meyer's mind. Accordingly, it is unsurprising that Walker did not contact Fred Meyer before he was fired because the notice, which originated from a different company (GIS), told him to take any disputes to that company rather than to Fred Meyer. (*Id.*) Fred Meyer's

27

contention that this undercuts Walker's claims is thus without merit.

Fred Meyer provides applicants with a pre-adverse action notice, but the notice provides only for direct disputes with GIS. Crucially, and for those with reports containing correct, negative information, the notice fails to inform applicants of any opportunity for recourse or a chance to discuss mitigating factors with Fred Meyer before adverse action is taken. Orwellian language aside, Fred Meyer's adverse action notice creates an impersonal hiring process by denying applicants an opportunity to discuss reports with their employer. The notice form is therefore inadequate and in violation of the FCRA.

### C. Fred Meyer's Claim That Ruling In Favor Of Walker Will "Upend" The Consumer Reporting Industry Misunderstands The Relief That Walker Seeks.

In its Answering Brief, Fred Meyer sounds a false alarm, predicting a collapse of the nationwide consumer reporting industry if the Court rules in Walker's favor. The Court should disregard such hyperbole. Requiring employers to notify and give applicants a meaningful chance to discuss their consumer reports with their employers would not prohibit the continued use of third-party consumer reporting agencies at all. It would merely end the practice of directing all disputes to such agencies when in reality, at least in this case, the

employer is the party making the employment decision.

Ignoring this, near the end of the Answering Brief Fred Meyer claims that Walker seeks to create a precedent that "directing a consumer-applicant's dispute or explanation of information contained in a consumer report to a third party agent is *per se* a violation of [the FCRA]." (ECF 19, at 46.) Fred Meyer goes on to suggest that such a ruling would "necessarily upend the entire nationwide consumer reporting agency industry" because employers regularly hire consumer reporting agencies. (*Id.*) This argument, proffered without any evidence, exaggerates and otherwise misunderstands the relief sought by Walker and the class.

Fortunately for the consumer reporting industry, Walker does not seek the "upending" precedent described by Fred Meyer. At no point has Walker suggested that the use of a third-party consumer report agency is a *per se* violation of the FCRA. In fact, Walker has conceded (as Fred Meyer reminded the Court) that disputing inaccuracies directly with the reporting agency may be useful for applicants. (ECF 10, at 38.) Such is the case because ensuring the accuracy of consumer reports is a duty essential to the functions of any reporting agency.

As Fred Meyer points out, the FTC has opined that employers are

permitted to hire consumer reporting agencies to fulfill "ministerial obligations" under the FCRA. (ECF 19, at 31); *see also FTC Advisory Opinion to Rosen* (June 9, 1998). The term "ministerial" refers to a task "of, relating to, or being a mandatory act or duty admitting of no personal discretion or judgment in its performance." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, MINISTERIAL (5th ed. 2019), www.ahdictionary.com/word/search.html?q=ministerial. This would include tasks necessary for compliance with the FCRA, such as obtaining and ensuring accuracy of consumer reports and providing applicants with requisite pre-adverse action notice—tasks entrusted to GIS by Fred Meyer.

Even further, the FTC has suggested that the FCRA does not prohibit consumer reporting agencies from making employment decisions on behalf of employers. *FTC Advisory Opinion to Allan* (Feb. 14, 2000); (ECF 19, at 31.) Thus, if an employer were to authorize a credit reporting agency to not only procure reports but to make employment decisions using the reports, applicants would have reason to discuss their reports directly with the agency. Such a scenario would provide meaningful opportunity even to applicants with accurate, negative reports because the reporting agency would have authority

and discretion to take adverse action—that is, the agency would have a mind to change.

The position that Fred Meyer has taken, however, straddles these two possibilities in a way that denies applicants their rights under the FCRA. As Fred Meyer has confirmed, GIS does not make employment decisions. (ECF 19, at 33.) Notwithstanding that, all discussions of consumer reports are diverted to GIS. (ER32.) In other words, Fred Meyer has assumed a precarious and unlawful middle ground—GIS is only given authority for ministerial tasks, but it is also expected to field any and all explanations, discussions, and disputes of consumer reports, without any authority to make decisions based on those discussions. As a result, applicants are deprived of any meaningful opportunity to discuss their reports with Fred Meyer—the actual mind that could potentially be changed—before adverse action is taken.

Walker merely asks that any employer who intends to take adverse action must give employees an opportunity to discuss the report's contents with the decision-maker. Compliance with the FCRA will not destroy a nationwide industry, nor will it prohibit the use of consumer reporting agencies to compile reports and handle disputes regarding inaccurate information (or even accurate information where

31

the agency is tasked with making the employment decision). The point is that irrespective of whether the discussion is handled by employers or their agents, the opportunity "must be real." *Magallon*, 311 F.R.D. at 633. Fred Meyer did not provide a real opportunity for applicants to discuss their reports, and therefore the dismissal of Walker's claim should be reversed.

## CONCLUSION

Fred Meyer's FCRA Disclosure contains extraneous information in violation of the plain language of the FCRA, the Court's recent holdings in *Syed* and *Gilberg*, and even the FTC's more relaxed guidance. Similarly, Fred Meyer's pre-adverse action notice violates the FCRA because it diverts all discussion of reports to an entity without authority to make hiring decisions, thereby denying applicants an opportunity to meaningfully discuss their reports with Fred Meyer.

Accordingly, the judgment of the District Court dismissing the claims should be reversed, and the case should be remanded for discovery and consideration of Walker's claims on their merits.

Dated: February 18, 2019          Respectfully submitted,

                                  By: /s/ Patrick H. Peluso
                                  Attorneys for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C), I certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,554 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), as well as the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

Dated: February 18, 2019    Respectfully submitted,

By: /s/ Patrick H. Peluso
Attorneys for Plaintiff-Appellant

# PROOF OF SERVICE

I am employed in the State of Colorado, County of Denver. I am over the age of 18 and not a party to the within suit; my business address is 3900 E Mexico Avenue, Suite 300, Denver, Colorado 80210.

On February 19, 2019, I served the document described as: **OPENING BRIEF** on the interested parties in this action by sending a true copy thereof to all counsel of record.

[ ]     BY MAIL (ENCLOSED IN A SEALED ENVELOPE): I deposited the envelope(s) for mailing in the ordinary course of business at Denver, Colorado. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. Under that practice, sealed envelopes are deposited with the U.S. Postal Service that same day in the ordinary course of business with postage thereon fully prepaid at Denver, Colorado.

[x]     BY E-MAIL: I hereby certify that this document was served from Denver, Colorado, by e-mail delivery on all counsel of record at their most recent known email address or e-mail of record in this action.

[ ]     BY FAX: I hereby certify that this document was served from Denver, Colorado, by facsimile delivery on the parties listed herein at their most recent fax number of record in this action.

[ ]     BY PERSONAL SERVICE: I delivered the document, enclosed in a sealed envelope, by hand to the offices of the addressee(s) named herein.

[ ]     BY OVERNIGHT DELIVERY VIA UNITED PARCEL SERVICE: I am "readily familiar" with this firm's practice of collection and processing correspondence for overnight delivery. Under that practice, overnight packages are enclosed in a sealed envelope with a packing slip attached thereto fully prepaid. The packages are delivered by our office to a designated collection site.

34

I declare under penalty of perjury that the foregoing is true and correct.

Executed this February 18, 2019 at Denver, Colorado.


Patrick H. Peluso                                    /s/ Patrick H. Peluso
Type or Print Name                              Signature